# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# WESTERN DIVISION

```
_____
                              )
In re:                        )
                              )
    FRANCIS A. MARCELLA, II,   )
    & JANICE F. MARCELLA,      )          Chapter 7
                              )          Case No. 05-50261-HJB
         Debtors.             )
                              )
_____)
_____
                              )
    JACK E. HOUGHTON, JR.,     )
    CHAPTER 7 TRUSTEE,         )
                              )
         Plaintiff,           )
                              )
    v.                        )
                              )          Adversary Proceeding
                              )          No. 07-04158-HJB
    FRANCIS A. MARCELLA, II,   )
    & JANICE F. MARCELLA,      )
                              )
         Defendants.          )
_____)
```

## MEMORANDUM OF DECISION

Before the Court is a complaint (the "Complaint") filed by Chapter 7 trustee Jack E.

Houghton, Jr. (the "Trustee") against Francis A. Marcella, II ("Francis") and Janice F.

Marcella ("Janice") (together, the "Debtors"), by which the Trustee asks the Court to order

the Debtors to turn over property of their bankruptcy estate and to revoke the Debtors'

discharge.  This is one of those hard cases where an appropriate result can not be derived

from a robotic examination of the facts and application of the law without administering a fair dose of equity.  The Court has considered carefully the Debtors' testimony, the admitted exhibits, and applicable law in determining whether the Debtors' admitted failures to report and turn over estate property to the Trustee were knowing and fraudulent or whether the Debtors were simply victims of sub-par and misguided legal advice.  Employing the discretion which is the fundamental inventory of all courts, this Court makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Bankruptcy Procedure 7052.

I.    <u>FACTS AND TRAVEL OF THE CASE</u>

On February 2, 2009, the Court held a trial on the Trustee's Complaint.  Two witnesses – the Debtors – testified, and fifteen exhibits were admitted.  Both Debtors testified credibly, with some exceptions.  Francis Marcella, aged sixty-one at the time of trial, noticeably struggled with clarity of recollection.  The Court concludes, however, that his difficulties stemmed not from evasive or misleading motives, but from a prolonged illness, accompanied by a series of small strokes, that have left him with a poor memory of specifics.  He was able to recall events, but had difficulty placing them in a coherent timeline.  He candidly admitted that his memory was at times vague and unreliable and that he depended almost exclusively on his wife, Janice, to maintain the household's day-to-day and long-term financial affairs.  Janice was forthright in her testimony, and the Court found that she, too, was credible; the few ambiguities and discrepancies in her testimony appeared to result only from memory lapses caused by the passage of time.

2

On October 15, 2005 (the "Petition Date"), the Debtors filed a voluntary bankruptcy petition[1] under Chapter 7 of the Bankruptcy Code,[2] a decision precipitated by extended unemployment and serious illness.  In 2003, Francis, a licensed electrician with thirty-five years of work experience, found himself unemployed.  Janice was also not working at the time, having left her employment in early 2002.  When unemployment assistance ran dry, the Debtors turned to existing credit lines to make ends meet, expecting to pay off their mounting debt upon Francis's anticipated re-employment.

Francis regained employment in the latter half of 2004, but shortly after returning to work, he became seriously ill with Legionnaires' disease, lapsing into a coma and ultimately unable to ever work again.  Having had no income for nearly a year, and realizing that Francis would not be returning to work, the Debtors necessarily began planning for a financial future that did not rely on ever-increasing debt.  In late 2004 or early 2005, Francis applied for payments from his union pension benefits.  At the time, the Debtors were told that Francis would not receive any payments until he was officially deemed disabled by the Social Security Administration – a process, they were informed, that could delay receipt of benefits for a year or more.

In November 2004, Janice retained attorney Richard Mulhearn ("Attorney Mulhearn") to prosecute a wrongful termination claim against her former employer, TD Banknorth, NA

---

[1] The Debtors had filed a previous bankruptcy case in the 1990's when their business failed and the Debtors were left with a large deficiency after foreclosure of the business assets.  Both Debtors testified that the previous bankruptcy filing was largely uneventful, having closed fairly quickly with no court appearances required.

[2] The Debtors' bankruptcy case was filed prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, title III, § 302, 119 Stat. 23 (2005). Accordingly, all references to the "Bankruptcy Code" or the "Code" are to the Bankruptcy Reform Act of 1978, as amended prior to April 20, 2005, 11 U.S.C. §§ 101, et seq.

("Banknorth").    After many years of work as a bank teller and customer service representative, Janice had not been promoted and believed the decision was fueled by discriminatory motives.    After her *pro se* complaint filed with the Massachusetts Commission Against Discrimination was unsuccessful, she hired Attorney Mulhearn to bring suit against Banknorth in the federal district court (the "Banknorth Claim").    According to Janice, however, Attorney Mulhearn informed her that the risk of loss was very high, and as a result, she had no expectation of receiving compensation on her claim in the short-term, if ever at all.

In January 2005, Janice met with attorney Anthony Doyle ("Attorney Doyle") to discuss the possibility of filing a bankruptcy case.    For reasons not explained, no bankruptcy case was then filed, and the Debtors continued to struggle financially.    In August 2005, Francis's sister, Maureen Chadbourne ("Chadbourne"),[3] loaned the Debtors $10,000 to ease their financial burden.    Despite still contemplating a bankruptcy case filing, the Debtors pledged to repay the loan.[4]

Sometime before the fall of 2005, the plan to file a bankruptcy case was revived. Using information provided to him by the Debtors, Attorney Doyle prepared their bankruptcy petition, schedules, statements, and other documents necessary for a Chapter 7 bankruptcy filing (the "Schedules and Statements").    In early October, Janice went to Attorney Doyle's office to retrieve the documents for review.    Francis had been physically

---

[3] This spelling is taken from the Trustee's proposed findings of fact, as nowhere else is the name identified.    The Debtors refer only to Francis's "sister" in their pleadings.

[4] In fact, Francis testified that they had hoped to use some funds from the lump-sum pension payment if they received it.    Trial Tr. 20.

unable to meet in Attorney Doyle's office in person, so Janice took the papers home for them to review, sign, and return to Attorney Doyle.  Both Francis and Janice signed the Schedules and Statements on October 5, 2005.[5]

Francis testified that he read the documents, and would have asked questions about anything he did not understand.  Trial Tr. 33.  Janice conceded that she did not read the Schedules and Statements "word for word," but did review "all the dollar amounts."  She felt she understood everything she read and did not recall asking Attorney Doyle any questions about the documents.  Trial Tr. 107.

Meanwhile, and unbeknownst to the Debtors, the long-awaited pension award was finalized (the "Pension Award").  On October 3, – two days *before* they signed the bankruptcy Schedules and Statements – $8,037.46 was electronically deposited into the Debtors' checking account (the "Checking Account").[6]  They did not become aware of the deposit until some days after.  By October 14, however, they had learned of the Pension Award, and on that date, Janice withdrew $5,000 from the Checking Account by cashier's check, intending to pay for long-needed furnace repairs.[7]

---

[5] The Debtors' signatures on the bankruptcy petition, statements, and schedules are "unsworn declarations made under penalty of perjury and are, according to federal law, the equivalent of a verification under oath."  JP Morgan Chase Bank v. Koss (In re Koss), 403 B.R. 191, 212 (Bankr. D. Mass. 2009) (quoting Poliquin v. Cox (In re Cox), No. 05-15357, 2009 WL 57523, at *2 (Bankr. D.N.H. Jan. 6, 2009); In re Grondin, 232 B.R. 274, 276 (1st Cir. BAP 1999)).

[6] The amount of the Pension Award was high because it represented payments for the preceding months while Francis awaited official disability status from the Social Security Administration.

[7] According to Janice, she withdrew the money to make the payment because she did not think the repair person would accept a personal check from the Debtors.  Ultimately, the repairs cost the Debtors $3,500, which they *were* able to pay by check.  In November, Janice re-deposited $3,500 into the Checking Account to cover the cost of the repairs and spent the remaining $1,500.

Although the Debtors signed the Schedules and Statements on October 5th, their case was not actually filed until October 15, 2005.[8]  The balance in their Checking Account on the Petition Date was $3,958.39.  In addition, they held the $5,000 cashier's check, having not yet paid for the furnace repairs.

### a.    The Bankruptcy Schedules and Statements

On Schedule A-Real Property[9] ("Schedule A"), the Debtors disclosed joint ownership of their residence in Dalton, Massachusetts (the "Property"), which they valued at $200,000.  Both Schedule A and Schedule D-Creditors Holding Secured Claims ("Schedule D") show secured claims against the Property totaling $170,397.38.[10]  On Schedule C-Property Claimed as Exempt ("Schedule C"), the debtors elected under 11 U.S.C. § 522(b)(1) to claim the remaining equity in the Property as exempt.[11]

---

[8] Both Debtors testified credibly that they did not then know of, and never have ascertained the reason for, the delay between the execution of the Schedules and Statements on the 5th and the filing of the petition on the 15th.  Copies of the Debtors' voluntary petition, schedules, and statements that Attorney Doyle provided to the Trustee in the course of discovery (admitted as Plaintiff's Exhibit 1) have the Debtors' "real" (as opposed to electronic) signatures and are dated October 5, 2005.  On the docket in the Debtors' bankruptcy case, however, the same documents contain electronic signatures (i.e., the Debtors' names are typed in the signature spaces and preceded by "/s/") and are dated October 15, 2005.  At trial, Francis recalled signing documents at home, but also vaguely remembered going to Attorney Doyle's office at some point.  He indicated that this was "towards October."  Trial Tr. 31-33.  But this recollection, like others at trial, was ambiguous and difficult to credit as to timing.  Janice did not testify to visiting Attorney Doyle's office with Francis in order to sign documents after the 5th.  And neither the Trustee nor the Debtors' current attorney questioned the Debtors regarding the discrepancy between the dates and types of signatures.

[9] Schedule A instructs debtors to "list all real property in which the debtor has any legal, equitable, or future interest . . . ."

[10] Schedule D discloses two mortgages on the Property: a first mortgage held by Chase Home Finance in the amount of $114,834.40 and a second mortgage held by Bank of America in the amount of $55,562.98.

[11] Under the Bankruptcy Code in effect as of the Petition Date, the maximum joint exemption the Debtor's could claim in their residence was $36,900.  See 11 U.S.C. § 522(b)(1); 11 U.S.C. §

On Schedule B-Personal Property ("Schedule B"),[12] the Debtors disclosed their joint ownership of the Checking Account at Greylock Federal Credit Union ("Greylock"), indicating that the balance in the account was $200.00.  Schedule B also indicated that the Debtors had no cash on hand.  On October 15, however, the actual Checking Account balance was $3,958.39 and the Debtors still retained possession of the $5,000 cashier's check.  The Trustee says the under-reporting of the balance in the Checking Account resulted from the Debtors' belief that $200 "was all that was allowed under the bankruptcy law."  Pl.'s Req. Findings Fact & Concl. Law ¶ 44.  Janice testified that she had, indeed, discussed with Attorney Doyle the amount the Debtors would be "allowed" in their Checking Account when they filed for bankruptcy relief.  Janice stated that Attorney Doyle had chosen the figure $200.  She further testified that, unaware that  the Pension Award had been deposited, she did not dispute Attorney Doyle's entry because she believed that $200 was a fair approximation of the Checking Account balance when the Schedules and Statements were signed.  Trial Tr. 112-13.  Francis testified that he was not  personally aware of the account balance since he relied entirely on Janice to manage the account.  Trial Tr. 37.

Schedule B also disclosed various other assets, consisting mainly of two IRA's, two vehicles, and various household goods and items, all of which were claimed as fully exempt on Schedule C.  Schedule B did not disclose the pending Banknorth Claim.[13]  In paragraph

---

522(d)(1).

[12] Schedule B instructs debtors to "list all personal property of the debtor of whatever kind."

[13] Arguably, the Debtors could, and should, have disclosed the lawsuit on Schedule B at number 20: "other contingent and unliquidated claims of every nature . . . ." or number 33: "other personal property of any kind not already listed."

7

4 of the Debtors' Statement of Financial Affairs,[14] however, the Debtors did disclose the lawsuit. There, they indicated that Janice had filed suit against Banknorth for wrongful termination and that the case was still pending. Further, the case caption, case number, and court where the case was pending were all disclosed. No exemption in any possible recovery on the Banknorth Claim was taken on Schedule C.

Schedule B also did not disclose the Debtors' interest in any bank accounts other than the Checking Account. The Trustee says the Debtors' Schedule B omitted additional accounts they held at Greylock. In response to the Trustee's examination at trial, Janice testified that they probably did have other accounts at Greylock, but that two undisclosed accounts existed only because of loans made by Greylock, which loans were disclosed on the Schedules and Statements. According to Janice, "every time you did a loan or did anything, they made you open an account, . . . . but they didn't have anything in them. It's just they made you open one when you did a loan with them or anything. Anything you did with them you had to open an account." Trial Tr. 112. Her testimony is corroborated by the bank account statements admitted as Plaintiff's Exhibit 8. Those statements reference the Checking Account and two installment loan accounts. Janice further testified that she believed they also held a savings account at Greylock with a $5.00 balance. Trial Tr. 112. Again, her testimony coincides with Exhibit 8, which identifies a "Primary Share" account with a $5.00 balance.[15]

---

[14] Paragraph 4 instructs debtors to "[l]ist all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing . . . ."

[15] The admitted bank statements contain account information from August 31, 2005 through December 31, 2005. There is no activity in the "Primary Share" account on any of the statements, with the balance reported each month as $5.00.

On Schedule F-Creditors Holding Unsecured Nonpriority Claims ("Schedule F"), the Debtors listed $82,152.28 in unsecured debts.  Most of the debts are identified as credit card or store credit debts.  The $10,000 unsecured loan from Chadbourne, however, was not listed.  Both Francis and Janice testified that Attorney Doyle was told about the loan, Trial Tr. 34, 108, and Janice said that she had noticed that it was not included on the Schedules and Statements.  She assumed that the loan was omitted because it was a personal loan from a family member, but did not question Attorney Doyle about the omission and never precisely understood why it was omitted.  Trial Tr. 109.

On Schedule I-Current Income of Individual Debtors ("Schedule I"), the Debtors reported a total monthly income of $2,853, consisting of a $1,702 monthly social security payment to Francis, an $826 pension payment to Francis, and Janice's $325 monthly income for housekeeping services.  According to Janice, the monthly pension income was included on Schedule I as the anticipated amount for the pension payment.  Instead of reporting the possible receipt of the Pension Award on Schedule B, Janice testified that it was included "as part of our income."  Trial Tr. 116.[16]

The final identified error is in the Debtors' Statement of Financial Affairs.  Paragraph 11 instructs debtors  to "[l]ist all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within one year immediately preceding the commencement of this case.  Include checking, savings, or other financial accounts . . . ."  Listed there is "Legacy Banks, checking, fall

---

[16] Janice did not testify as to whose idea it was to "report" the pension payment in this manner.  Francis, however, recalled contacting his union to find out what the monthly pension stipend would be once received, because Janice needed the information to give to Attorney Doyle to include in the Schedules and Statements.  Trial Tr. 27, 75.

2004." But the Debtors did not have an account at Legacy Banks ("Legacy") prior to filing

for bankruptcy. They did, however, have an account at Banknorth that was closed in late

2004 or early 2005. The Debtors could not explain why the closed account was

misidentified as a Legacy Banks, as opposed to Banknorth, account.

### b.    Postpetition Events

The meeting of creditors required by § 341 of the Bankruptcy Code was held on

December 2, 2005 (the "341 Meeting"). At the 341 Meeting, the Trustee questioned the

Debtors regarding the Banknorth Claim. According to the Trustee, he told Janice that "she

should not proceed with her discrimination claim without the express permission of the

Bankruptcy Court and/or the Chapter 7 Trustee." Pl.'s Req. Findings of Fact & Concl. of

Law ¶ 37. The Debtors testified differently. According to both, the Trustee told them that

Janice should inform the Trustee if the case were to settle and that if the amount of

settlement were not significant, they would not need to worry about it.[17] The Trustee does

not dispute the Debtors' further assertion that, after the 341 Meeting, Attorney Doyle told

Janice that all she needed to do was to provide the Trustee with Attorney Mulhearn's name

and contact information (which she did) and call Attorney Mulhearn to tell him about the

bankruptcy case and provide him with the Trustee's information (which she also did). Trial

Tr. 123, 125, 141-42. Neither Attorney Mulhearn nor the Trustee, however, ever contacted

the other. According to the Trustee's answers to interrogatories, he has never discussed

the Banknorth Claim with Attorney Mulhearn. Def.'s Ex. B.

---

[17] Neither the recording nor the transcript from the 341 Meeting were offered or admitted into
evidence. Nor did the Trustee testfy.

On December 9, 2005, the Trustee entered a notice on the docket in the main case that the 341 Meeting had been held as scheduled. The Trustee did not file a report indicating that there were no assets available for distribution to creditors (a "No-Asset Report"). But neither did he indicate that assets were potentially available for distribution or request that the Court establish a date by which creditors should file claims in the event of a distribution. And he also did not request an extension of the deadline to file an objection to the Debtors' discharge (the "Discharge Deadline"). Instead, the docket reflects that no activity was taken in the case after the December 9 entry. The Discharge Deadline having passed with no objection or request for extension filed, the Court issued an order discharging the Debtors on February 8, 2006 (the "Discharge"). In the normal course, the case would have closed promptly thereafter. It remained open, however, because a No-Asset Report was never filed.

In March 2006, approximately five months after the Petition Date, Janice agreed to settle the Banknorth Claim for $17,000. On April 11, 2006, Attorney Mulhearn mailed Janice a check in the amount of $11,334 – her net share of the settlement proceeds after deducting attorney's fees of $5,666 (the "Settlement Proceeds"). Janice testified that she paid Chadbourne $5,000 from the Settlement Proceeds. The remainder of the Settlement Proceeds, she explained, were used to pay property taxes, repairs to the sewer line, miscellaneous bills, and the mortgage. Trial Tr. 126. Janice did not consult with Attorney Doyle or the Trustee prior to settling the case, and she did not tell Attorney Doyle or the Trustee that she received the Settlement Proceeds. According to Janice, since she had provided the Trustee and Attorney Mulhearn with the information she was instructed to and had heard nothing further from the Trustee or Attorney Doyle regarding the Banknorth

11

Claim, she believed that she was free to settle the case. <u>Trial Tr.</u> 125. At trial, Janice testified that she had not understood, during and after the settlement, that the Settlement Proceeds belonged to the bankruptcy estate. <u>Trial Tr.</u> 143. Believing she had dispensed with her obligations regarding the claim, she took Attorney Doyle at his word and concluded that nothing further was required. <u>Trial Tr.</u> 125.

Francis testified similarly. At trial, he recalled the discussion at the 341 Meeting relative to the Banknorth Claim and remembered his wife providing contact information to both the Trustee and Attorney Mulhearn. <u>Trial Tr.</u> 38. Francis, like Janice, believed that the Trustee was responsible for contacting Attorney Mulhearn and stated that Attorney Doyle did not explain to them their responsibilities in the event of a settlement. <u>Trial Tr.</u> 54, 69. He testified that "at no time did anyone ever say to me or my wife, until I hired Attorney Ford, that all monies had to go through [the Trustee]. We honestly were not aware of that, and it wasn't anything done intentionally . . . . Just ignorance of it." <u>Trial Tr.</u> 40.

Eight months passed with no activity in the Debtors' bankruptcy case, and still the case remained open. On October 30, 2006, the Court issued a Notice of Inactivity to the Trustee, noting that the case had been inactive for over six months and requesting a response by November 30. Activity in the case then resumed in early December. On December 4, 2006, the Trustee requested that the Court issue a deadline by which creditors should file claims. He also filed a motion for authority, pursuant to Federal Rule of Bankruptcy Procedure 2004, to examine the Keeper of Records for Fleet Bank, seeking information relative to the Debtors' refinance of their home in January 2003. The next day, December 5, the Court issued a Notice of Assets, setting the deadline by which creditors should file proofs of claim.

12

Contemporaneous with his December 4 filings, the Trustee sent a letter to Attorney Doyle, requesting certain documents from the Debtors, including copies of tax returns from 2004 and 2005, copies of documents related to the 2003 refinancing, copies of bank statements from 2005, and copies of documents related to the Banknorth Claim. He also separately requested written advice regarding the status of the Banknorth Claim. Pl.'s Ex. 2.

In response, Attorney Doyle replied by letter dated December 5. In the letter, he acknowledged the December 4 filings and the Court's December 5 notice to creditors. But he enclosed a copy of the Debtors' Discharge and questioned "how [the Trustee's] recent mailings and requests may be allowed after the discharge . . . ." Pl.'s Ex. 3. Unimpressed with this response, the Trustee responded by letter dated December 8, stating that the Debtors' Discharge was irrelevant to the Trustee's asset investigation and requesting, again, that the documents be provided to him by January 4, 2007. Pl.'s Ex. 4. Several days later, in the absence of any objections, the Court granted the motion to conduct the Rule 2004 examination of Fleet Bank. And, in January of 2007, the Debtors provided the requested documents and information.[18]

Months passed. There was no activity in the Debtors' case, and no further communication from the Trustee. The Debtors' case remained open. According to the Debtors, they were still struggling to maintain mortgage and car payments in early 2007 and began to inquire into a possible refinancing of the Property in order to consolidate their

---

[18] Though not directly stated, the Court infers that the documents were provided. The Trustee alleges nowhere that the Debtors were recalcitrant in their response and later acknowledged in a letter to Attorney Doyle that documents had been provided in January 2007.

secured debts, pay off the unsecured debt owed to Greylock,[19] and lower their payments by securing an interest rate lower than the interest rate on their home equity loan, which had recently been adjusted upward. Trial Tr. 127-28. Janice believed that she would not be able to obtain traditional refinancing due to the bankruptcy case filing and turned to Kathy Daury ("Daury"), a friend who was employed by Legacy Banks ("Legacy"). Daury agreed to help the Debtors obtain a new loan from Legacy to pay off their existing mortgages and other debts. Trial Tr. 127. Aware of the Debtors' bankruptcy filing, however, she was concerned about closing the loan if the Debtors had not received their discharge. There was no testimony regarding whether Daury inquired into the closing of the bankruptcy case or whether she asked or provided information to the Debtors regarding the need for court approval of the transaction while the case remained open.

Janice then called Attorney Doyle regarding the status of the bankruptcy case and told him they were considering a refinance. Doyle told her that, inasmuch as the Debtors had received the Discharge, they were free to refinance the Property. In fact, he was so assured of the propriety of the action that he offered to act as closing attorney for the transaction and the closing took place at Attorney Doyle's office. The only parties present were the Debtors and Attorney Doyle. Trial Tr. 61, 73.

The new loan from Legacy (the "Refinance"), totaling $200,000, closed in April 2007. The proceeds were used to pay off the two existing mortgages, the balance of the loan

---

[19] Although Greylock's unsecured loan had been listed on the Debtors' bankruptcy petition (and, therefore, subject to the Discharge), the Debtors had continued to make payments on the loan, a decision expressly contemplated by the Bankruptcy Code. See 11 U.S.C. § 524(f) ("Nothing contained in [the provisions providing for reaffirmations of prepetition debts] prevents a debtor from voluntarily repaying any debt.").

from M&T Bank used to purchase the Debtors' truck, and the Greylock unsecured loan.

The Debtors received net proceeds of $6,618.64 from the Refinance.  Of this amount,

$5,000 was used to pay the remainder owed to Chadbourne.  The rest the Debtors spent.

Neither the Debtors nor Attorney Doyle sought court approval for the transaction, nor did

they inform the Trustee of the Refinance or receipt of the proceeds.

On August 2, 2007, eight months after the Debtors had provided the documents

requested by the Trustee in December 2006, the Trustee sent another letter to Attorney

Doyle.  It stated:

> . . .
>
> I have had an opportunity to review this case again, as well as the documents which you supplied me with back in January of 2007.  I have the following comments:
>
> • I note from the Statement of Financial Affairs that the Debtor Janice Marcella had a wrongful termination case against Banknorth, upon which no exemption was taken.  *From the documents which were supplied to me,* on April 11, 2006 the Debtor received a total settlement of $17,000 on account of said claim from which she received a check for $11,334. . . .  There are numerous problems with this payment.  For one, . . . the wrongful termination claim was an asset of the estate.  There was no exemption taken against same so that the entire proceeds belong to the estate. Attorney Mulhern's [sic] employment needed to approved [sic] by the Bankruptcy Court in order to obtain his fees; however, that was not done.  At a minimum, the Debtor's net settlement proceeds of $11,334.00 should be turned over to me, forthwith.  Demand is hereby made for the Debtors to turnover to me that amount sometime within the next ten (10) days.
>
> • There is the issue about the bank account(s).  The Debtor listed having one bank account with Greylock.  In fact, the Debtors have two bank accounts, both at Greylock. . . .  On October 14, 2005, the Debtors wrote a check for $5,000, thereby reducing their account to $3,958.39.  I would like to have a copy of both sides of this check and an explanation from the Debtors as to: 1) Why they wrote the check when they did and 2) what the monies were used for.  In any event, at a minimum, the resulting balance in the account as of the date of

the filing of the Chapter 7 Petition was $3,958.39, more than
$3,758.00 than what was indicated on the Bankruptcy Petition. The
Debtors only claimed an exemption for $200 from said checking
account.  Accordingly, at least $3,758.39 of the account is estate
monies which should be turned over to me forthwith.  Demand is
hereby made of the turnover to me of those funds of $3,758.39 within
the next ten (10) days.  In doing so, I do not waive or release the
Debtors from the $5,000.00 withdrawal that was made the day before
the Bankruptcy filing.

•       Then there is the house.  The Debtors listed the fair market value of
the house as of the date of the filing of the Petition to be $200,000.00.
Some of the data bases indicate a value of approximately
$225,000.00.  The Debtors claimed an exemption against same of
$29,602.62.  I note, now, that the Debtors, notwithstanding the fact
that the case is still open, refinanced their house in April of 2007 with
Legacy Bank, obtaining a mortgage of $200,000.00.  The refinance
was done without my approval, and Bankruptcy Court permission.
Please forward me copies of all documents from the closing . . .
sometime within the next thirdy [sic] (30) days.  I reserve the right to
claim resulting equity in the house once I have had an opportunity to
review these documents.

        I need the Debtors full and complete attention to this matter, as well
as their cooperation in turning over to me the demanded funds.  I am
considering filing a complaint for revocation of their discharge based on the
above actions.

Pl's Ex. 5 (emphasis added).  At trial, the Debtors testified that, after discussing the

Trustee's demands with Attorney Doyle, Attorney Doyle told them not to turn over the

requested funds.  Trial Tr. 69.  According to the Debtors, Attorney Doyle reacted with

surprise toward the Trustee's tone, particularly believing that the Settlement Funds rightfully

belonged to the Debtors since the Trustee had never followed through with Attorney

Mulhearn.  According to Janice, she was similarly surprised by the Trustee's demands, as

she had provided all the information and documentation previously requested.  She testified

that, when the Trustee requested information in January of that year, Attorney Doyle urged

16

them not to worry about the inquiries.  She stated at trial:  "So I really, all the while this was going on, I thought it was nothing.  I just figured they were trying to clarify that I hadn't done anything, you know, wrong, that I had said something or hid something, which I didn't.  I never intended to; we told [Attorney Doyle] everything that, you know, we possibly could." Trial Tr. 140.

Following another letter from the Trustee (which was not admitted into evidence), Attorney Doyle responded to the Trustee on October 5, 2007.  In his letter, Attorney Doyle requested a meeting between himself, the Debtors, and the Trustee, hoping to clarify what had happened during the case.  In that letter, he also attempted to address the Trustee's contentions.  Pl.'s Ex. 6.  Not satisfied with that response, the Trustee filed the present adversary proceeding on October 12, 2007, demanding turnover of property of the bankruptcy estate and asking the Court to revoke the Debtors' Discharge.

After the suit was filed, the Debtors obtained new counsel, attorney Terry Ford ("Attorney Ford"), who has since represented the Debtors in their main bankruptcy case and in the adversary proceeding.  On June 3, 2008, the Trustee filed a motion seeking court approval of a settlement between the Trustee and the Debtors.  Pursuant to the proposed settlement, the Debtors had agreed to pay $25,000 to the Trustee in satisfaction of all claims.  But in open court, the Court expressed reluctance to approve the settlement in light of the facts as described by the Trustee at the hearing.  The hearing on approval of the settlement was continued, but then canceled when the Trustee thereafter withdrew his settlement approval request.  The $25,000 remains in escrow with the Trustee pending the outcome of this adversary proceeding.

17

On November 7, 2008, the Debtors moved to amend their Schedule B in the main bankruptcy case. The amended schedule disclosed the Checking Account balance, as well as the Debtors' possession of the $5,000 cashier's check, as of the Petition Date. It also included a potential legal malpractice claim against Attorney Doyle. According to Janice, the schedules were not previously amended because Attorney Doyle had never discussed it with them. Trial Tr. 140. The Trustee objected to Debtors' request to amend Schedule B. At the hearing on the motion to amend, the Debtors expressed their desire to have full disclosure of assets filed on the docket, and emphasized that they were not moving to amend their exemptions in light of the circumstances of the case. The Court allowed the Debtors to amend Schedule B, while specifically noting that the allowance did nothing to excuse any otherwise inexcusable omissions from the originally-filed schedules. Thereafter, the Court conducted a trial in the adversary proceeding and took the matter under advisement.

II.     POSITIONS OF THE PARTIES

The Complaint contains three counts. In Count II, the Trustee seeks an order requiring the Debtors to turn over property of the bankruptcy estate. Specifically, the Trustee seeks turnover of the Settlement Proceeds, the undisclosed and non-exempt Checking Account funds, and the $5,000 separately held by the Debtors on the Petition Date. The Trustee also demands turnover of undisclosed, non-exempt equity in the Debtors' real and personal property. With regard to the real property, the Trustee asserts that the Property was undervalued on Schedule A. The Trustee contends that the Property was actually worth $220,000 on the Petition Date – $20,000 more than the Debtors'

18

valuation and claimed exemptions.  Accordingly, he requests an order compelling the Debtors to turn over $20,000 representing the value of that non-exempt equity.  He also contends that the Debtors had excess, non-exempt value in personal property that must be turned over.  In Count III, the Trustee asks the Court to surcharge the Debtors' exemptions to the extent they are unable or unwilling to satisfy any of the turnover demands.

The Debtors concede that they have an obligation to turn over property of the estate, and note that $25,000 is currently being held in escrow to satisfy their obligations in that regard.  They dispute, however, the Trustee's valuation of their residence and personal property.  The Debtors argue that the values listed in their schedules were reasonably accurate.  The Debtors also object to any surcharge of their exemptions, asserting that either (1) they have already turned over an amount in excess of the value of estate property sought by the Trustee or (2) they are not obligated to turn over any monies at all.  As to the latter point, the Debtors question the propriety of the Trustee's demands for turnover under the circumstances, because, they say, he delayed prosecution of the bankruptcy case for so long that the doctrine of laches should now bar his requests.

In Count I of the Complaint, the Trustee argues that the Debtor's Discharge should be revoked.  Although it is unclear in the Complaint, the Trustee's proposed findings of fact and conclusions of law indicate that he relies on both § 727(d)(1) and § 727(d)(2) of the Bankruptcy Code in support of revocation.  The Trustee asserts that the Debtors engaged in intentional and fraudulent conduct warranting a revocation of their Discharge by: (1) misrepresenting the number of bank accounts they held; (2) failing to disclose the receipt of the Pension Award; (3) misrepresenting the Checking Account Balance on the Petition

19

Date; (4) failing to disclose the $5,000 cash held on the Petition Date; (5) failing to include

the Banknorth Claim on Schedule B; (6) misrepresenting the value of their real property;

(7) misrepresenting the value of their personal property; (8) failing to list all of their

creditors; (9) failing to disclose all of their income; (10) failing to disclose and turn over the

Settlement Proceeds; (11) failing to disclose use of estate property – i.e., the Settlement

Proceeds and Refinancing proceeds – to pay off Chadbourne; and (12) obtaining the

Refinance without informing the Trustee or receiving Court authority.

The Debtors, on the other hand, note that this adversary proceeding was filed over

a year and a half after their Discharge entered, and they first argue that the Trustee is

barred from seeking revocation based on the doctrine of laches.  In any event, the Debtors

claim that they did not act with the requisite fraudulent intent warranting a revocation of

their Discharge.  They say they did not attempt to hide assets and disclosed all requested

information to Attorney Doyle and to the Trustee.  With the exception of failing to disclose

the receipt of the Pension Award (which they claim was simple ignorance of its receipt at

the time they signed their Schedules and Statements), they place much of the blame on

Attorney Doyle for failing to properly assist and advise them.  At trial, Francis stated:

"There's everything that I did and . . . everything that I've told Attorney Doyle and

everything that I gave Attorney Doyle and everything he asked me for I gave to him

truthfully.  What he gave me was not – he didn't do anything truthfully. . . . And then he told

us we had a discharge . . . [w]hich got us into more hot water. . . . So, yes, I blame him for

a lot of it, yes, sir. . . . And my ignorance of the law is part of it, but I blame the majority of

[it] on the attorney because that's why I hired an attorney, so I wouldn't wind up in a mess

like this."  <u>Trial Tr.</u> at 40-41.  Because they relied on the advice of their attorney in good

faith and after full disclosure, the Debtors argue that they simply have not acted with

knowing and fraudulent intent.

III.    DISCUSSION

    **a.    Count II: Turnover of Property**

With the commencement of a bankruptcy case, a new estate (the "bankruptcy

estate") is created, comprised of "all legal or equitable interests of the debtor in property

as of the commencement of the case."  11 U.S.C. § 541(a)(1).  Property of the bankruptcy

estate encompasses an incredibly broad range of potential and existing property interests;

included in the estate is "every conceivable interest of the debtor, future, nonpossessory,

contingent, speculative, and derivative . . . ."  In re Yonikus, 996 F.2d 866, 869 (7th Cir.

1993) (citations omitted); see also Nickless v. McGrail & McGrail (In re Dooley), 399 B.R.

340, 348 (Bankr. D. Mass. 2009).  Section 542(a) provides that any entity must turn over

property of the estate, so long as it is "property that the trustee may use, sell, or lease .

. . , or that the debtor may exempt under section 522 of this title . . ., unless such property

is of inconsequential value or benefit to the estate."  11 U.S.C. § 542(a).  And § 541(a)(4)

requires debtors to "surrender to the trustee all property of the estate . . . ."  11 U.S.C. §

521(a)(4).  The statutory language is plain and the rule is clear.  Laches and the passage

of time are no defense to the obligation of any party to turn over bankruptcy estate

property.[20]  Accordingly, as the Trustee is correct in his assertion that the $5,000 cashier's

---

[20] See, e.g., McNally v. Echart (In re Echart), 374 B.R. 596, 598 n.2 (Bankr. E.D. Tex. 2007)
("[N]o amount of inactivity by the Chapter 7 Trustee could relieve the Debtors . . . of their affirmative
duties to disclose and to surrender their bankruptcy estate property to the Trustee pursuant to 11
U.S.C. § 521(a)(4).").
    Similarly, the Debtors' obligation to turn over estate property is unaffected by this Court's

check, the excess Checking Account balance, and the Banknorth Claim and Settlement Proceeds[21] constituted property of the Debtors' bankruptcy estate, the value of that property must be turned over to the Trustee.[22]

The Trustee has also argued, though not at great length, that the Debtors should be ordered to turn over the value of personal property that was not disclosed on their schedules. According to the Trustee, the Debtors have not accounted for and disclosed approximately $19,000 worth of personal property in their possession on the Petition Date. His argument is premised on the discrepancy between the $6,000 value of "household furnishings" listed on Schedule B and the $35,000 value of "Antiques and Household [Goods]" listed in the "Other Assets" portion of the Debtors' loan application submitted in

---

decision on whether revocation of the Debtors' Discharge is warranted. See Swinson v. Baber (In re Baber), 2007 WL 3113336, *6 (Bankr. N.D. Okla. Oct. 22, 2007); Morris v. Morris (In re Morris), 2008 WL 819296, *9-10 (Bankr. D. Kan. March 26, 2008) (even though debtor's discharge was not denied, the debtor was still obligated under § 542(a) to turn over tax refunds that were property of the estate); Hill v. Muniz (In re Muniz), 320 B.R. 697, 702 (Bankr. D. Colo. 2005) ("The fact that Debtor's discharge is revoked does not nullify the legal obligations which she voluntarily invoked upon the filing of her bankruptcy petition. She is still obligated to pay over to the Trustee the value of the non-exempt property which she possessed or was entitled to receive as of her petition date . . . .").

[21] See In re Dooley, 399 B.R. at 348 (prepetition workers' compensation claim was property of the bankruptcy estate); Wood v. Premier Capital, Inc. (In re Wood), 291 B.R. 219, 224 (B.A.P. 1st Cir. 2003) (prepetition worker's compensation claim was property of bankruptcy estate, as were proceeds from settlement of claim); Pare v. Campopiano (In re Campopiano), 1994 WL 675317, *3 (Bankr. D.R.I. Nov. 23, 1994) (proceeds of insurance policy that was property of the estate were also property of the bankruptcy estate).

[22] Notably, the Trustee has not moved to compel Attorney Mulhearn to turn over his share of the Settlement Proceeds. Nor has the Trustee asked this Court to declare the settlement void as a violation of the automatic stay under § 362, see In re Dooley, 399 B.R. at 351, although it is doubtful that the Court would declare the settlement here void, as more than three years have passed since its finalization.

connection with the Refinance (the "Loan Application").[23]  Both the Debtors and the

Trustee agree that the Debtors have not obtained postpetition personal property to

account for the difference in purported value.

In order for the Trustee to prevail, the Court would need to find either that (1) the

$35,000 value included on the Loan Application reflected the true value of the Debtors'

household personal property, while the property was undervalued on Schedule B; or (2)

the Debtors possessed additional, undisclosed property at the time of filing.  The Court has

not been presented with a preponderance of evidence to support either alternative.

First, the Trustee has produced no evidence and elicited no testimony tending to

show that the Debtors possessed additional, undisclosed personal property omitted from

Schedule B.[24]  Second, the Court finds it more likely that the $35,000 value cited in the

Loan Application was inflated, with the values placed on the personal property in Schedule

B more closely reflecting the truth.  The Debtors both testified credibly that Daury, who

assisted Janice in filling out the Loan Application, chose the $35,000 figure.  After Janice

expressed surprise at the seemingly high valuation of their household property, Daury

explained that $35,000 was a "standard" figure used on loan applications and reflected the

cost of replacing the items and not the value of the items if they were to be sold.  Trial Tr.

---

[23] The Debtors actually disclosed and exempted $13,300 in personal property that could be characterized as "household" goods in their schedules.  In Schedule B, the Debtors listed the following: (1) "Household furnishings including furniture, tvs and appliances" valued at $6,000; (2) "Miscellaneous books and cds" valued at $500; (3) "Miscellaneous clothes" valued at $1500; (4) "Miscellaneous watches, rings and necklaces" valued at $3,000; and (5) "Lawn mower & snow blower" valued at $2,000.  These items were all claimed as exempt on Schedule C.  This results in a total difference between the values on Schedule A and the Loan Application of $21,700.

[24] With the exception of the Banknorth Claim and the proceeds from the Pension Award, which the Court assumes the parties are not claiming are "household goods."

23

64-65, 131-32.   Regardless of the accuracy of Daury's advice, the Court finds that the

Debtors accepted them without further argument.   In sum, the Court rules that the Debtors

fully disclosed and exempted (with the exception of the Banknorth Claim and the proceeds

of the Pension Award) all personal property they owned on the Petition Date.

The only remaining question is whether, as the Trustee claims, the value of the

Debtors' residence was greater than $200,000 as valued by the Debtors on Schedule A.

If so, the Trustee would be entitled to seek a sale of the Property to recover the amount

of non-exempt equity or he could seek the value of the non-exempt equity from the

Debtors in settlement of the bankruptcy estate's entitled share.

In accordance with § 542(a), the estate's interest in the Property is measured as

of the Petition Date. 11 U.S.C. § 542(a).   Determining what the value of that interest is,

however, is not a straightforward or simple task:

> There is no word used in the bankruptcy court which is more elusive
> than the word value.  It is not surprising how many different results are had
> when more than one person looks at a piece of real estate.  The real test,
> of course, is when the deal is closed in connection, therewith, after a
> reasonable willing buyer and a reasonable willing seller, neither being under
> duress, have reached an agreement on price in the open market.  Short of
> the real test, determining the value of property is a difficult task, made more
> difficult . . .  [when] the figures arrived at by both sides are so close.
>
> Value is subject to fluctuations caused by market fluctuations,
> changes in interest rates and general economic factors. . . . The Court
> listens to evidence of value and must determine which appraisal figure to fix
> upon.  In making that determination, the Court is not bound by any figure in
> particular, but merely guided by them all.  This is because "[a]n appraisal of
> a property is not the result of a scientific analysis," but is, rather, a subjective
> opinion which can and does differ from the next appraisal even though both
> may be based on real estate market trends.

In re Rehbein, 49 B.R. 250, 252-53 (Bankr. D. Mass. 1985) (citations omitted).

The Trustee relies on two appraisals in support of his claim that the Property was

24

worth $220,000 on the Petition Date, and not $200,000 as the Debtors claimed.  The first appraisal cited by the Trustee is one commissioned by Legacy in conjunction with the Refinance (the "Legacy Appraisal").  The Legacy Appraisal estimated the value of the Property as $250,000 *as of March 26, 2007*.  The second appraisal, conducted by Residential Appraisal Service on April 7, 2008 at the request of the Trustee (the "Residential Appraisal"), purports to value the property "as of October 15, 2005" as $220,000.

The Debtors claim that both the Legacy and Residential Appraisals are inaccurate and inflated assessments of the Property's value on the Petition Date, because both take into account improvements to the Property that occurred postpetition.  Instead, the Debtors claim that their valuation of the Property on Schedule A is more reasonable. According to Janice, the $200,000 value included on Schedule A was taken from the tax assessed value.  She explained that she was aware that tax assessment values were often lower than fair market values.  But after considering the Property's malfunctioning furnace and backed-up sewer, she believed $200,000 was a "fair", if not slightly exaggerated, assessment of the Property's value.[25]  Trial Tr. 151-52.

Since the filing of the case, both the sewer line and the furnace have been repaired. In addition, with the help of donated labor and supplies from friends, a half-bathroom in the lower level was converted to a full bathroom after the filing of the bankruptcy case.[26]

---

[25] The Debtors also submitted into evidence an exterior appraisal apparently commissioned by the Trustee in February 2006.  That appraisal valued the Property at $190,000 to $210,000. Although this appraisal tends to corroborate the Debtors' own assessment of value, the Court finds it ultimately unnecessary to rely on that appraisal to estimate the value of the Property.

[26] The conversion of the lower level half-bathroom to a full bathroom was intended to ease the difficulties associated with Francis's illness, since he could not traverse the stairs to the full

None of these improvements appear to have been considered and factored out of the Residential Appraisal,[27] and each of the improvements was taken into consideration in the Legacy Appraisal.

Given the improvements to the Property and taking into account the likely appreciation between October 2005 and March 2007, the Court finds the Legacy Appraisal unpersuasive in establishing the Property's value on the Petition Date.  Likewise, the Court finds that the Residential Appraisal does not discount the improvements that were made after the case was filed.  Because the Residential Appraisal was only $20,000 more than the estimated value on Schedule A, the difference can easily be accounted for by slight variations in value estimations – variations which grow with the passage of time – and the postpetition improvements.  Thus, the Court finds that the estimate of fair market value given by the Debtors in Schedule A should be accorded due weight as a reasonable and persuasive valuation of the Property.  Because the excess equity was claimed as exempt on the Debtors' Schedule C, an exemption now deemed valid,[28] the Trustee has not persuaded the Court that the Debtors are obligated to turn over additional funds representing excess equity in the Property.

In sum, the Trustee has demonstrated that the Debtors had in their possession $8,758.39 in non-exempt funds in the Checking Account and cashier's check on the Petition Date and received, postpetition, an additional $11,334 in the proceeds of non-

---

bathroom located on the Property's second floor.

[27] For instance, the Residential Appraisal indicates that the Property had two full bathrooms when it actually had only one full bathroom and one half-bathroom on the Petition Date.

[28] See 11 U.S.C. 522(I); Taylor v. Freeland & Kronz, 503 U.S. 638 (1992).

exempt estate property.  The Debtors will accordingly be ordered to turn over $20,092.39 to the Trustee.[29]

### b.      Count I: Revocation of Discharge

"Revocation of discharge is an extraordinary remedy. . . .[that] runs contrary to the general policy of the Bankruptcy Code of giving Chapter 7 debtors a fresh start."  In re Jordan, 521 F.3d 430, 433 (4th Cir. 2008) (internal citations and quotations omitted). "[T]he statutory right to a discharge should ordinarily be construed liberally in favor of the debtor."  In re Koss, 403 B.R. 191, 211 (Bankr. D. Mass. 2009); see also Yules v. Gillis (In re Gillis), 403 B.R. 137, 144 (1st Cir. BAP 2009) ("because revoking a discharge is an extraordinary remedy, § 727(d) should be construed liberally in favor of the debtor and strictly against those objecting to discharge").

The Trustee, as the party seeking revocation, bears the burden of proving that revocation of the Debtors' Discharge is warranted.  In re Foster, 343 B.R. 385, 392 (Bankr. D. Mass. 2006).  "For § 727 objections to discharge, the substantive evidentiary standard of proof is preponderance of the evidence."  R. I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes), 229 B.R. 253, 259 n.7 (1st Cir. BAP 1999).

### i.      Section 727(d)(1)

The Trustee does not specifically refer to § 727(d)(1) in the Complaint, but later refers to that section in his post-trial filings.  And many of his allegations squarely fit within the parameters of § 727(d)(1).  That section provides that a debtor's discharge shall be revoked if:

---

[29] Because the Trustee is currently holding $25,000 in escrow pending the outcome of this case, the ultimate result will be a return to the Debtors of $4,907.61.

(1)     such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge

11 U.S.C. § 727(d)(1).

Nondisclosure of prepetition property is "the classic example of obtaining a discharge by fraud," Still v. Gault (In re Gault), 2006 WL 2270338, *3 (Bankr. E.D. Tenn. Aug. 4, 2006) (citing 6 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 727.15[2] (15th ed. revised 2006)), and is therefore grounds for revocation under § 727(d)(1).   The Trustee claims that the Debtors omitted assets and engaged in fraudulent misrepresentations that fall under the rubric of "fraud" contemplated by this section. Specifically, the following alleged actions would be encompassed in a § 727(d)(1) claim: (1) misrepresentation of the number of the Debtors' bank accounts; (2) misrepresentation of the Checking Account Balance; (3) failure to disclose the Debtors' possession of the $5,000 cashier's check; (4) failure to include the Banknorth Claim on Schedule B; (5) failure to disclose accurate income; and (6) failure to list all creditors.

Regardless of whether these actions were committed with the requisite fraudulent intent, however, the Trustee cannot prevail because the action is time-barred.  Section 727(e)(1) provides that revocation of discharge claims under § 727(d)(1) must be brought "within one year after such discharge is granted."   Here, the Debtors' Discharge was granted on February 8, 2006.  The adversary proceeding objecting to the Discharge, however, was not filed until October 12, 2007, approximately nineteen months after the Discharge was entered.  Accordingly, the Court cannot revoke the Debtors' Discharge on § 727(d)(1) grounds.

28

ii.     *Section 727(d)(2)*

The Trustee also seeks to revoke the Debtors' discharge pursuant to § 727(d)(2), which provides that a debtor's discharge shall be revoked if:

> (2)     the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee.

11 U.S.C. § 727(d)(2).  In contrast to the more limited time in which a § 727(d)(1) action may be brought, a request for revocation of discharge under § 727(d)(2) may be brought before the *later* of: "(A) one year after the granting of such discharge; and (B) the date the case is closed."  11 U.S.C. § 727(e)(2).  Because the case has not been closed, the § 727(d)(2) claim was timely filed.

"Section 727(d)(2) provides that a chapter 7 debtor's discharge may be revoked if the following elements are met: (1) the debtor acquired property of the estate; and (2) the debtor knowingly and fraudulently failed to report or deliver the property to the trustee." In re Gillis, 403 B.R. at 145-46.  The Trustee has demonstrated that the Debtors acquired property of the estate after the Petition Date – namely, the Settlement Proceeds and, arguably, the Refinancing proceeds – and the first element has accordingly been established.

The only question, then, is whether the Debtors "knowingly and fraudulently" failed to report the acquisition of and deliver the property to the Trustee.  "Knowingly" requires proof that "the Debtor's failure was accompanied by knowledge that the property in question belonged to the estate and that he was obliged to report or surrender it to the Trustee (as the case may be)."  In re Foster, 343 B.R. at 393.  In other words, the Debtors

29

must have been consciously aware that the acquired property was property of the estate.

Where a trustee pointedly advises a debtor that certain property belongs to the estate and

must be turned over upon receipt, bankruptcy courts have had no difficulty in concluding

that the debtor acted "knowingly," even when the debtors have received contradictory

advice from an attorney.[30]

Regarding the Refinance proceeds, there is no indication that the Debtors were

aware of the estate's interest, if any, in those proceeds.   Indeed, the possibility of a

refinance was not a topic broached between the Trustee and the Debtors.   And even given

the impropriety of the refinance, the only information the Debtors received indicated that

a refinance was permissible so long as a discharge had entered.   Although case law in the

First Circuit, and in other jurisdictions, indicates a general wariness to excuse misconduct

based solely on allegedly erroneous counsel, see, e.g., Boroff v. Tully (In re Tully), 818

F.2d 106, 111 (1st Cir. 1987), the Court finds no evidence that the Debtors actually knew

or had reason to know of the estate's possible interest in proceeds from the Refinance.

The acquisition of the Settlement Proceeds presents a more difficult question.

Because the transcript from the 341 Meeting was not produced or admitted into evidence,

the Court is left with competing accounts of what, exactly, the Debtors were told regarding

the estate's interest in the Settlement Proceeds.   The Trustee asserts that he informed the

Debtors of the estate's entitlement to any proceeds from the Banknorth Claim.   The

---

[30] See, e.g., Fokkena v. Klages (In re Klages), 381 B.R. 550, 554 (8th Cir. BAP 2008);  In re Echart, 374 B.R. 596; In re Baber, 2007 WL 3113336; Richardson v. Schoemperlen (In re Schoemperlen), 332 B.R. 179 (Bankr. C.D. Ill. 2005); In re Muniz, 320 B.R. 697.

Debtors testified that the Trustee suggested only a possible interest in the proceeds if a settlement or judgment were to yield sufficient value.  Although it is a close call, the Court finds that the Debtors were aware of the Trustee's interest in the suit and can be charged with "knowing" that the estate had a possible interest in any potential settlement or judgment award.

But knowledge alone is not enough.  The Trustee also must demonstrate that the Debtors acted fraudulently.  "Fraudulently" under § 727 has been held to encompass both a "specific intent to defraud the Trustee or the estate," In re Foster, 343 B.R. at 393, and, in some instances, a "reckless disregard for the truth," In re Koss, 403 B.R. at 213.[31]  In determining whether a debtor has acted fraudulently, courts look to a variety of factors, including a debtor's course of conduct, surrounding circumstances, and sophistication.  See, e.g., In re Yonikus, 974 F.2d 901, 905 (7th Cir. 1992); In re Koss, 403 B.R. at 213; In re Bartel, 2009 WL 2461727, at *6-7.

The Trustee's strongest claim for revoking the Debtors' Discharge on grounds that they acquired and fraudulently failed to report and turn over estate property rests on the Debtors' failure to report and turn over the Settlement Proceeds.  In response, the Debtors say that they did not act fraudulently because they relied on the advice of Attorney Doyle

---

[31] See also  Massachusetts v. Bartel (In re Bartel), 2009 WL 2461727, *6 (Bankr. D. Mass. Aug. 10, 2009); Guardian Indus. Products, Inc. v. Diodati (In re Diodati), 9 B.R. 804, 808-09 (Bankr. D. Mass. 1981).
    Many of the cases detailing conduct rising to the level of a "reckless disregard for the truth" are in the context of § 727(a)(4) claims. Section 727(a)(4) contemplates an objection to a debtor's discharge before discharge is entered.  That section provides that a debtor's discharge can be denied if the debtor "knowingly and fraudulently, in or in connection with the case" engaged in certain bad acts, including making a false oath, presenting or using a false claim, or withholding information or documents related to the debtor's property or financial affairs from an officer of the estate."  11 U.S.C. § 727(a)(4).

and the Trustee's perceived inaction.  Having provided the information requested by the Trustee and disclosed the pending bankruptcy case to Attorney Mulhearn, as advised by counsel, they believed that the Trustee's subsequent lack of action or inquiry constituted disinterest in any proceeds from the Banknorth Claim.

Generally speaking, a debtor may not escape the consequences of acting in violation of the Bankruptcy Code by pleading ignorance and pointing the finger at former (or current) counsel as the bearer of bad advice.  This was made patently clear in In re Tully, where the First Circuit Court of Appeals upheld the denial of a debtor's discharge under § 727(a)(4) for failure to disclose prepetition assets. 818 F.2d 106.  Rejecting the debtor's argument that the omissions were simply attorney error, the Tully Court upheld the lower court's finding that the debtor knowingly and fraudulently made a false oath or account in connection with the case, which are grounds for the denial of discharge under section § 727(a)(4).  Id. at 111.

Specifically, the First Circuit in Tully noted that the Debtor had amended his schedules multiple times to include initially undisclosed property, but continued to omit other estate property despite pointed questioning from the Chapter 7 trustee.  Id. at 110-11.  In affirming the denial of discharge, the First Circuit held that it either was or should have been evident to the debtor that the assets ought to have been disclosed in the schedules; the debtor's behavior amounted, at the very least, to a "reckless indifference to the truth."  Id. at 112.  The Tully Court emphasized the debtor's "cavalier indifference and a pattern of disdain for the truth" and the debtor's disregard for the importance of full disclosure and candor.  Id.  Noting the difficulties the Trustee had in obtaining full disclosure from the Debtor, the First Circuit placed the blame squarely on his shoulders:

32

"The law, fairly read, does not countenance a petitioner's decision to play a recalcitrant game, one where the debtor hides, and the trustee is forced to go seek." Id.

While casting a jaundiced eye toward "my attorney did it!" claims, the First Circuit in Tully did not hold that reliance on an attorney's advice could *never* negate the element of fraudulent intent in an attack on a debtor's entitlement to a discharge.  And in In re Mascolo, the First Circuit noted that "an explanation by a bankrupt that he had acted upon advice of counsel who in turn was fully aware of all the relevant facts generally rebuts an inference of fraud." 505 F.2d 274, 277 (1st Cir. 1974).  Other courts have also reiterated that, in limited circumstances, a debtor's genuine and reasonable reliance on an attorney's advice may preclude a finding that the debtor acted with fraudulent intent.[32]

Here, the Debtors claim reliance on (1) Attorney Doyle's statements indicating that they would fulfill their responsibilities toward the Trustee by providing full disclosure of the Banknorth Claim and Attorney Mulhearn's contact information and (2) the Trustee's apparent inaction after the 341 Meeting.  While the Banknorth Claim was not listed on the Debtors' Schedule B, all details related to the claim were fully disclosed on the Statement

---

[32] See, e.g., First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986) ("Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts"); Neary v. Darby (In re Darby), 376 B.R. 534, 541 (Bankr. E.D. Tex. 2007) ("a debtor's reliance on advice of counsel can, under proper circumstances, constitute an excuse for an omission of assets from schedules when there has been a full disclosure of all pertinent facts to the lawyer and such reliance has been placed reasonably and in good faith"); Seaver v. Markey (In re Markey), 378 B.R. 594, 604 (Bankr. D. Minn. 2007) ("[R]eliance in fact on the advice of counsel may prevent a finding of actual knowledge of impropriety, at least 'if the advice is reasonable' and the attorney was fully-informed before giving it." ) (quoting In re Sendecy, 283 B.R. 760, 765 (8th Cir. BAP 2002)); Colish v. United States (In re Colish), 289 B.R. 523, 542 (Bankr. E.D.N.Y. 2003) ("It is well established that the advice of counsel is a complete defense to a charge of fraud where a full and fair disclosure of the facts is made.") (citations omitted); Watson v. Jackson (In re Jackson), 141 B.R. 702, 706  (Bankr. D. Ariz. 1992) ("Generally, a debtor acting in reliance on the advice of counsel lacks the intent required to be denied a discharge.").

of Financial Affairs,[33] and the Debtors testified truthfully and fully at the 341 Meeting in

response to the Trustee's questions.[34]    There is no evidence that they provided

ambiguous, misleading, or contradictory answers regarding the claim.[35]    There is no

---

[33] Compare with In re Yonikus, 974 F.2d 901 (debtor's discharge denied after debtor failed to disclose prepetition lawsuit on schedules, failed to turnover postpetition settlement proceeds, did not disclose lawsuit to bankruptcy attorney or trustee, and gave evasive and noncredible testimony); Stornaweye Fin. Corp. v. Hill (In re Hill), 387 B.R. 339, (1st Cir. BAP 2008) (discharge denied under § 727(a); debtor's disclosure of tax refund on Statement of Financial Affairs was insufficient because it was misleading); In re Wood, 291 B.R. 219 (motion to amend schedules to exempt prepetition worker's compensation claim was denied, because, among other things, debtor failed to disclose the claim anywhere in schedules or statements and did not disclose the claim at the section 341 meeting, even when questioned about employment termination); In re Nagel, 2003 WL 23811677 (failure to disclose possible receipt of inheritance, even though debtor's mother died prepetition); Olsen v. Reese (In re Reese), 203 B.R. 425 (Bankr. N.D. Ill. 1997) (discharge revoked under § 727 where debtors knew about possible receipt of tax refund, but did not disclose it on petition; failed to disclose receipt at § 341 meeting despite having received funds one day prior, and were recalcitrant and uncooperative with trustee's demands for documents); see also Puckhaber v. Schwartz (In re Schwartz), 64 B.R. 285 (Bankr. D.N.H. 1986) (trustee's motion to revoke discharge under § 727(d)(2) denied where debtors disclosed prepetition interest in mortgage, answered trustee's questions at § 341 meeting and were not on notice of trustee's interest in the property).

[34] Compare with In re Wood, 291 B.R. 219; Richardson v. McCullough (In re McCullough), 259 B.R. 509 (Bankr. D.R.I. 2001) (debtor's discharge revoked under § 727(d)(2) where debtor lied at § 341 meeting regarding receipt of trust funds); In re Reese, 203 B.R. 425; see also In re Schwartz, 64 B.R. 285.

[35] Compare with In re Yonikus, 974 F.2d 901; In re Bartel, 2009 WL 2461727 (debtor acted with at least reckless disregard for the truth in failing to disclose assets; debtor testified ambiguously and inconsistently at trial and Rule 2004 exeamination and discharge was denied under § 727(a)); In re Gillis, 403 B.R. 137 (debtor acted knowingly and fraudulently in failing to turn over proceeds from estate assets; debtor testified inconsistently regarding the assets at the § 341 meeting and the later deposition); Buckeye Ret. Co., LLC v. Heil (In re Heil), 289 B.R. 897 (Bankr. E.D. Tenn. 2003) (fraudulent behavior found found where debtor made inconsistent statements regarding perceived obligations, failed to disclose asset to his own attorney and the trustee and had received advice from another experienced bankruptcy attorney that the asset should be disclosed); Krommenhoek v. Covino (In re Covino), 241 B.R. 673 (Bankr. D. Idaho 1999) (debtor found to have acted fraudulently in concealing assets; debtor gave misleading testimony at § 341 meeting, lacked credible and corroborative documentation, and provided inconsistent assertions of asset ownership in separate context); In re Couch, 54 B.R. 682 (Bankr. E.D. Ark. 1985) (where debtor failed to disclose interest in stock, even after amending schedules, and testified inconsistently and in contradiction to other evidence regarding reason for omission, debtor acted knowingly and fraudulently under 727(d)).

evidence that they attempted to obstruct the Trustee's search for information or failed to provide documentation and information related to the claim or Settlement Proceeds when requested in December 2006.[36]  While the Debtors' assumption that they were free to keep the Settlement Proceeds because they had not heard from the Trustee in quite some time was a gravely erroneous one, they were not entirely unreasonable in concluding that the Trustee's knowledge of the Banknorth Claim would prompt him to more actively monitor the case.[37]

After considering the Debtor's testimony in light of the surrounding circumstances, the Court concludes that the Debtors did not act fraudulently in failing to report and turn over the Settlement Proceeds.  While self-serving statements of ignorance and reliance on others are cautiously considered, the Court finds that this case differs from others where such excuses are more readily disregarded.  The Debtors relied on the poor advice of their attorney.[38]  They have acted with candor and full disclosure when questioned.  And

---

[36] Compare with In re Nagel, 2003 WL 23811677; In re Reese, 203 B.R. 425; In re Jackson, 141 B.R. at 706 (where debtor's claim that she disclosed receipt of inheritance property to counsel was not credible, debtor did not offer any other explanation for failure to disclose, admitted that she discussed with counsel the need to disclose the property, failed to bring relevant paperwork to deposition, and repeatedly denied access to bank account, and where other debtor's omissions and recalcitrance damaged credibility, discharge was revoked under § 727(d)(2)).

[37] While not excusing a debtor's obligation to turn over estate property, "in certain circumstances knowledge of particular facts by a trustee might shed light upon whether a debtor's actions were taken with the mental state required under the statute . . . ."  In re Echart, 374 B.R. at 598 n.2.

[38] See also Morris v. Wright (In re Wright), 371 B.R. 472, 481 (Bankr. D. Kan. 2007) (despite inconsistencies and inaccuracies in the schedules, Debtor had relied on advice of counsel and agreement with his ex-wife to share tax refund that belonged to the estate; the court held that the debtor "did not understand the process and understandably relied on his counsel. . . . While [the debtor's] belief was misguided and ill-advised," debtor had not acted with fraudulent intent); Grant v. Putnam (In re Putnam), 85 B.R. 881, 883-84 (Bankr. M.D. Fla. 1988) (where debtor did not disclose interest in deceased father's estate on bankruptcy petition, but had informed his lawyer about it, and both he and his attorney believed he was entitled to nothing, debtor did acted

they have provided information and documentation when asked to do so.  The Trustee's request for revocation of the Debtors' Discharge for failure to disclose and turn over the Settlement Proceeds will accordingly be denied.

Similarly, the Court cannot find that the Debtors acted with fraudulent intent when they refinanced the Property in April 2007.  Although Janice worked in the banking industry for many years, she worked mainly as a teller and in customer service.  She had no responsibility for examining, evaluating, or passing on the propriety of loan applications. Francis had even less experience in financial matters; he has a high-school education and was a fairly careful and intelligent speaker, but was clearly reliant on others for all matters financial.  Both Debtors turned to those with more experience and education for advice and assistance with the Refinance, and they received a consistent message – so long as a discharge had entered, the Debtors were free to refinance.  And so they did, without an intent to hide the transaction or defraud the Trustee.

Having found that the Debtors did not act knowingly and fraudulently in failing to disclose and turn over estate property acquired after the Petition Date, the Court will rule in favor of the Debtors on Count I and deny the Trustee's request to revoke their Discharge.


IV.    <u>CONCLUSION</u>

The Court ultimately rules that the Debtors are entitled to keep their Discharge. This decision was not made lightly, and nothing here should be interpreted as a

---

knowingly and fraudulently in failing to report interest and in waiving his interest in probate estate).

willingness to allow a debtor to "play[ ] ostrich and bury[ ] his head deeply enough in the sand [to] disclaim all responsibility." <u>In re Tully</u>, 818 F.2d at 111.  Rather, on the unique circumstances of this case, this Court concludes that the Debtors did not act with the intent required to revoke a discharge under § 727(d)(2).  The Debtors do not, however, escape their responsibility to turn over estate property; they are obligated to the estate in the amount of $20,092.39.  Accordingly, the Court will enter judgment in conformity with this Memorandum for the Trustee on Count II of the Complaint in the amount of $20,092.39 and for the Debtors on Count I.  Because the Debtors have provided the Trustee with sufficient funds to satisfy their obligations under Count II, Count III, which sought to surcharge the Debtors' exemptions in an amount necessary to compensate the estate for the value of any property not turned over, will be denied as moot.

DATED: October 15, 2009                    By the Court,

Henry J. Boroff
United States Bankruptcy Judge

37